IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| In re: ) | |
| ) | |
| MALCOLM SHAWN PHINNEY, SR. ) | Chapter 7 |
| and CYNTHIA PHINNEY, ) | Case No. 04-34202 |
| ) | |
| Debtors. ) | Adv. Proc. No. 07-03137 |
| ) | |
| ) | |
| KEITH L. PHILLIPS, TRUSTEE, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | Civil Action No. 3:09CV34-HEH |
| ) | |
| DARNELL WHITAKER, *et al.*, ) | |
| ) | |
| Appellees. ) | |

## MEMORANDUM OPINION
(Affirming Order of the Bankruptcy Court)

THIS MATTER is before the Court on appeal from an Order of the United States Bankruptcy Court for the Eastern District of Virginia ("Bankruptcy Court") issued on December 10, 2008, entering judgment for Defendants. The parties have filed memoranda of law in support of their respective positions. The Court will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and argument would not aid in the decisional process. Based on an extensive review of the record in this case and for the reasons stated herein, the Court will affirm the Order of the Bankruptcy Court.

## I. BACKGROUND

### A. <u>Procedural and Factual History</u>

On April 28, 2004, Malcolm Shawn Phinney, Sr. and Cynthia Phinney ("Debtors") filed a Chapter 13 bankruptcy petition with the Bankruptcy Court. On December 9, 2004, the Bankruptcy Court approved a consent order modifying the automatic stay entered into between Debtors and Washington Mutual Bank ("Washington Mutual"), the holder of the first deed of trust on the Debtors' primary residence at 616 Robcurn Drive in Henrico County, Virginia. Shortly thereafter, on January 18, 2005, the Bankruptcy Court confirmed the Debtors' Chapter 13 plan.

After the confirmation, the Debtors failed to comply with their agreement with Washington Mutual, and Washington Mutual issued a deed of trust notice of sale for the Debtors' property. The sale was scheduled for April 26, 2006. At some point before the sale, the Debtors received a flyer from Defendant Walkwood Properties, Inc. ("Walkwood") advertising services that may help prevent the foreclosure. Defendant Darrell Underwood, president of Walkwood, visited the Debtors and offered to help them find a purchaser for their home, who would negotiate with Washington Mutual.

The Debtors expressed interest in this arrangement, and they met with Defendant Darnell Whitaker to discuss a sale of the 616 Robcurn Drive property. On April 25, 2006, the Debtors and Whitaker entered into a real estate purchase contract. Under the agreement, Whitaker allowed the Debtors to remain in their home pursuant to a year-long

lease with a rental rate of $1,650 per month. Whitaker also afforded the Debtors an option to repurchase the property for $205,000, which expired on April 30, 2007.

The Debtors conveyed the property to Whitaker by deed, dated April 25, 2006, and recorded on May 8, 2006. In turn, Whitaker arranged for the pending foreclosure sale to be canceled in exchange for a payment of $19,119.56 to Washington Mutual. On May 25, 2006, after securing a refinancing loan from Bank of America, Whitaker paid Washington Mutual $157,298.50 to cover the balance of the Debtors' outstanding mortgage. Walkwood received $10,183.30 for arranging the purchase.

On September 12, 2006, the Debtors' bankruptcy case was converted to Chapter 7, and Keith Phillips was appointed the trustee. After the case was converted, the Debtors failed to make their monthly rental payments. In January 2007, Whitaker evicted the Debtors from the property and transferred the property to an entity he owns, Walt Dominion Properties, LLC ("Walt Dominion"), for no consideration.

On October 9, 2007, the Trustee filed this adversary proceeding asserting five counts against Defendants. The Trustee claims that 1) the Debtors' property transfer to Whitaker constitutes a fraudulent conveyance voidable under § 548; 2) the transfer was an unauthorized post-petition transfer of estate property voidable under §§ 549 and 550; 3) Defendants intended to defraud the Debtors and their creditors out of the equity in the 616 Robcurn Drive property thus making them liable to the estate for actual damages; 4) the transfer was unconscionable and should be avoided; and 5) Defendants are liable to

the estate for punitive damages in the amount of $100,000. The Bankruptcy Court held a trial on the Trustee's claims on July 29, 2008, at the end of which the Bankruptcy Court requested proposed findings of fact and conclusions of law from the parties and continued the hearing for closing argument. The Bankruptcy Court heard closing argument from the parties on September 16, 2008, and ruled from the bench that judgment would be entered for Defendants on all counts. The Bankruptcy Court issued an opinion detailing its ruling on December 10, 2008.

### B. Bankruptcy Court Decision

The Bankruptcy Court concluded that the Trustee's claims were not supported by sufficient evidence. As for Underwood and Walkwood, the Bankruptcy Court found that they received a payment of $10,183.30 for their involvement in the purchase, but neither party acquired an interest in the Debtors' property. The Bankruptcy Court also found no evidence demonstrating any intent to defraud the Debtors on the part of Underwood or Walkwood. Therefore, it dismissed all of the Trustee's claims against Underwood and Walkwood.

Likewise, the Bankruptcy Court found no evidence in the record supporting the Trustee's claims of fraud and unconscionability or its request for punitive damages. The Bankruptcy Court determined that the Debtors transferred their property to Whitaker after being fully informed of the transaction and understanding the consequences of their actions. The Bankruptcy Court also found that neither Whitaker nor Underwood were on

notice that the Debtors were in a pending bankruptcy case. Further, the Bankruptcy Court concluded that, while Defendants were motivated by their desire to make a profit, their actions do not shock the conscience. Based on its findings that Defendants did not intend to defraud the Debtors, that the Debtors were fully informed about the transaction, and the nature of the agreement, the Bankruptcy Court dismissed Counts III, IV, and V of the Complaint. The Bankruptcy Court also dismissed Count I of the Complaint, ruling that 11 U.S.C. § 548 was inapplicable to the case because it applied only to transfers made before a bankruptcy filing.

The remaining portion of the Bankruptcy Court's opinion addresses whether the Trustee may recover from Whitaker or Walt Dominion pursuant 11 U.S.C. § 549. The Bankruptcy Court relied on the methodology employed in *Cooper v. GGGR Invs., LLC*, 334 B.R.179 (E.D. Va. 2005). The Bankruptcy Court found that the fair market value of the Debtors' property was between $224,000 and $230,000. It found that Whitaker paid $176,418.06 for the Debtors' property—the loan payoff amount of $157,298.50 plus the $19,119.56 paid to cancel the foreclosure sale. The Bankruptcy Court then subtracted the amount paid by Whitaker from the property's fair market value to determine that the Debtors' equity in the property ranged from $47,581.94 to $53,581.94.

Next, the Bankruptcy Court found that the Debtors' option to repurchase the home carried a value of between $19,000 and $25,000—the difference between the property's market value and the option's repurchase price. In accordance with *Cooper*, the

5

Bankruptcy Court then combined the option's value with the amount paid to Washington Mutual to cancel the foreclosure sale to determine that the Debtors received between $38,119.56 and $44,119.56 for their equity in the property. Thus, the Bankruptcy Court found that Debtors recovered between 80.1% and 82.3% of their equity in the property. In the alternative, the Bankruptcy Court calculated the amount received by the Debtors by excluding the value of the Debtors' option to repurchase. Without factoring in the value of the option, the Bankruptcy Court found that the Debtors recovered between 76.7% and 78.8% of the property's value by comparing the $176,418.06 paid by Whitaker to the property's market value.

The Bankruptcy Court concluded that Whitaker paid present fair equivalent value for the Debtors' property in accordance with § 549. Therefore, the Bankruptcy Court ruled that the Trustee could not avoid the transfer. To support its ruling, the Bankruptcy Court relied on the percentage of recovery in the transaction and the comparative return of the Debtors' equity. It also noted that property sales of bankruptcy trustees rarely result in a 100% recovery of the property's value to support its decision.

The Trustee appealed the Bankruptcy Court's decision to this Court. The Trustee challenges 1) the Bankruptcy Court's inclusion of Whitaker's payment to Washington Mutual to discharge the Debtors' loan; 2) the Bankruptcy Court's ruling that Whitaker paid present fair equivalent value for the property; 3) the Bankruptcy Court's application of the *Cooper* methodology; 4) the Bankruptcy Court's finding that Whitaker was a good-

faith purchaser without notice of the Debtors' pending bankruptcy proceeding; 5) the Bankruptcy Court's decision to include the value of the repurchase option in the amount received by the Debtors; and 6) the Bankruptcy Court's ruling dismissing the Trustee's claims against Underwood and Walkwood.

## II. STANDARD OF REVIEW

On appeal, this Court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013. This Court "review[s] the bankruptcy court's legal conclusions *de novo* and its factual findings for clear error." *In re Hartford Sands Inc.*, 372 F.3d 637, 639 (4th Cir. 2004). In cases where the issues present mixed questions of law and fact, the Court will apply the clearly erroneous standard to the factual portion of the inquiry and *de novo* review to the legal conclusions derived from those facts. *Gilbane Bldg. Co. v. Fed. Reserve Bank*, 80 F.3d 895, 905 (4th Cir. 1996).

## III. ANALYSIS

### A. The Bankruptcy Court did not err by ruling that Whitaker constitutes a good-faith purchaser of the Debtors' property.

The Trustee contends that Whitaker cannot be a "good faith purchaser without knowledge of the commencement of the case" under 11 U.S.C. § 549(c). The record contains conflicting testimony on this issue. Mrs. Phinney testified that she told the man who came to her home initially that she and her husband were involved in a Chapter 13 case. Mrs. Phinney's testimony on this point, however, was inconsistent in that she

7

mistakenly testified that Whitaker was the first man to come to her home, rather than Underwood. The record also shows that Mr. Phinney signed an affidavit at the time of settlement affirming that he was not currently involved in a bankruptcy proceeding. Further, the title examination of the Debtors' property did not reveal any notice of the Debtors' bankruptcy.

After hearing this evidence, the Bankruptcy Court found that neither Underwood nor Whitaker received prior notice that the Debtors were involved in a pending bankruptcy proceeding and, thus, Whitaker qualified as a good-faith purchaser. In light of these facts and its review of the record, this Court cannot find that this factual finding by the Bankruptcy Court was clearly erroneous. Accordingly, the Court will affirm the Bankruptcy Court's factual finding that Whitaker received no notice of the pending bankruptcy proceeding and that he qualified as a good-faith purchaser.

**B.     The Bankruptcy Court did not err by ruling that Whitaker paid present fair equivalent value for the Debtors' property.**

The Trustee's primary objection to the Bankruptcy Court's decision is its ruling that Whitaker paid "present fair equivalent value" for the Debtors' property. Section 549(a) generally prohibits post-petition transfers of property. 11 U.S.C. § 549(a). Section 549(c), however, provides an exception to the general rule, stating that a bankruptcy trustee may not avoid a post-petition transfer of property to a good-faith purchaser who paid present fair equivalent value for the property. *Id.* § 549(c). The party seeking protection under § 549(c) bears the burden of establishing the applicability of the

exception. Fed. R. Bankr. P. 6001 ("Any entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof.").

The Trustee contends that the Bankruptcy Court erred by giving value to the repurchase option afforded the Debtors and by considering the $157,298.50 Whitaker paid to Washington Mutual to satisfy the Debtors' outstanding mortgage. Without these figures, the Trustee contends that Whitaker paid only $19,119.66 for equity valued at $53,581.94, or $.35 on the dollar. The Trustee also maintains that the Bankruptcy Court erred by applying the methodology used in *Cooper v. GGGR Invs., LLC*, 334 B.R. 179 (E.D. Va. 2005), a case interpreting the term "reasonably equivalent value" in 11 U.S.C. § 548.

### 1. The Bankruptcy Court's factual findings of the value paid by Whitaker

The evidence shows that, after entering into an agreement to purchase the Debtors' property, Whitaker paid $19,119.56 to Washington Mutual to cancel the foreclosure sale. Whitaker later paid $157,298.50 to Washington Mutual to satisfy the outstanding balance of Debtors' mortgage. Whitaker also agreed to lease the property to Debtors for a period of one year for a rental rate of $1,650 per month and afforded the Debtors an option to repurchase the property for $205,000 on or before April 30, 2007.

The Trustee's calculation of the amount paid by Whitaker completely ignores the value of the repurchase option. The Trustee contends that the option has no value because the Debtors could not practically exercise the option. The repurchase option

9

afforded to the Debtors by Whitaker to repurchase the property at a below-market rate, however, clearly has some value, and the Debtors' inability to exercise the option is irrelevant to its valuation. *See Jimmy Swaggert Ministries v. Hayes*, 310 F.3d 796, 803 (5th Cir. 2002).

To calculate the value of the repurchase option, the Bankruptcy Court relied on the methodology used in *Cooper*. While the Trustee is right in saying that *Cooper* does not dictate the result adopted by the Bankruptcy Court, the Bankruptcy Court reasonably relied on *Cooper*'s methodology as a guide. In *Cooper*, a debtor sold his home, valued at $260,000, for $150,032.32, with a lease-back provision and an option to repurchase the home for $178,000. *Cooper*, 334 B.R. at 183. The bankruptcy court found that the repurchase option was worth $82,000—the difference between the home's market value and the option's repurchase price. *Id.* at 185 n.7. It then added the value of the option to the $20,000 paid by the purchaser to the lender to postpone foreclosure and to the debtor. *Id.* The *Cooper* court compared the $102,000 figure to the debtor's equity of $129,968 and found that the debtor received 78% of his equity in the home. *Id.* The bankruptcy court concluded that the purchaser satisfied the "reasonably equivalent value" requirement in § 548. *Id.*

The facts of this case are sufficiently similar to justify relying on *Cooper*'s methodology. Thus, the Bankruptcy Court did not err in finding that the value of the option was between $19,000 and $25,000. Moreover, the Bankruptcy Court did not err by

10

combining the option's value with the $19,119.56 paid by Whitaker to cancel the foreclosure sale and finding that the Debtors recovered between 80.1% and 82.3% of their equity in the property.

## 2. The Meaning of "Present Fair Equivalent Value"

Federal appellate case law interpreting the phrase "present fair equivalent value" in § 549 is in short supply. In *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994), the Supreme Court of the United States discussed the meaning of "reasonably equivalent value" in § 548. The Supreme Court stated that Congress, while using the phrase "fair market value" throughout the Bankruptcy Code, "seemingly [went] out of its way" to avoid using the term "fair market value" in § 548. *BFP*, 511 U.S. at 537. The Supreme Court thus concluded that "reasonably equivalent value" could not be measured against a benchmark of "fair market value." *Id.* at 537–38. Instead, the Supreme Court held that "reasonably equivalent value," in the context of a mortgage foreclosure sale, equals the price a third-party purchaser paid for real property at a foreclosure sale, as long as the sale complied with all applicable state laws. *Id.* at 545.

The United States Court of Appeals for the Fifth Circuit extended *BFP*'s holding to § 549(c) in the context of a post-petition tax foreclosure sale. *T.F. Stone Co. v. Harper*, 72 F.3d 466, 472 (5th Cir. 1995). The Fifth Circuit ruled that § 549(c)'s "present fair equivalent value" requirement should not be measured against the property's "fair market value." *Id.* at 472. While acknowledging that Congress meant something

different in § 549 when it used the phrase "present fair equivalent value," the Fifth Circuit stated that it was unable "to perceive a meaningful difference between 'reasonably' and 'present fair' as applied in the context of this forced-sale case." *Id.* at 470. In other words, the Fifth Circuit stated that, "in a forced-sale context, a value that is 'reasonably equivalent' is also 'fair equivalent,' and vice versa." *Id.* (noting that the *BFP* court used the terms "reasonably" and "fair" in tandem, suggesting they have the same meanings).

The United States Court of Appeals for the Eighth Circuit disagreed and declined to extend *BFP*'s holding to § 549(c). *Miller v. NLVK, LLC*, 454 F.3d 899 (8th Cir. 2006). In *Miller*, the Eighth Circuit reasoned that the "use of 'present fair' indicates an intent [by Congress] that the protection of § 549(c) be limited to truly innocent purchasers who have actually paid a fair price in the transaction." *Id.* at 902. Thus, courts must analyze the actual amount paid to determine whether a purchaser paid "present fair equivalent value." *Id.* The amount paid includes the total amount of any surviving liens on the property, regardless of whether the purchaser legally assumed those mortgages. *Id.* ("[W]e believe that liens on the property are relevant for determining the value paid . . . whether or not those liens are legally assumed by the third-party purchaser.").

The Court need not determine which holding applies to this case because Whitaker paid "present fair equivalent value" for the Debtors' property under either theory. The Trustee, relying on *Miller* and several district court rulings, essentially contends that "present fair equivalent value" equates to "fair market value." The Court finds, however,

12

that "present fair equivalent value," like "reasonably equivalent value," cannot be measured against the benchmark of "fair market value." As noted in *BFP*, Congress "seemingly [went] out of its way to avoid" the term "fair market value." *BFP*, 511 U.S. at 537. Had Congress intended for the protection of § 549(c) to extend only to third-party purchasers who paid "fair market value" for property, it could have expressly used that phrase, which it elected to do numerous times throughout the Bankruptcy Code. It chose not to do so, and, thus, "[m]arket value cannot be the criterion of equivalence in the foreclosure-sale context." *Id.* at 538.

Contrary to the Trustee's contention, *Miller* does not conflate "present fair equivalent value" with "fair market value." Instead, *Miller* stands for the proposition that § 549(c)'s "more exacting" standard protects only "innocent purchasers who have actually paid a *fair price* in the transaction." *Miller*, 454 F.3d at 902 (emphasis added). Thus, the Court must examine the value paid by Whitaker to ensure that it represents a fair price in light of the relevant circumstances.

In light of the facts of the case and the rare circumstance in which a bankruptcy trustee recovers 100% of a property's value, the Bankruptcy Court found that the Debtors' recovery of between 80.1% and 82.3% of their equity constituted "present fair equivalent value." The Court finds no error in the Bankruptcy Court's calculations or in its ruling. The Debtors' recovery of at least 80% of their equity constitutes a fair price or "present fair equivalent value" as required by § 549(c). Therefore, the Court will

affirm the Bankruptcy Court's ruling that Whitaker paid "present fair equivalent value."

The Court would also note that, by its own calculation, Whitaker actually paid more than 87% of the property's fair market value. Whitaker paid between $195,418.06 ($19,119.56 + $157,298.50 + $19,000) and $201,418.06 ($19,119.56 + $157,298.50 + $25,000). These figures include the $19,119.56 Whitaker paid to cancel the foreclosure sale, the value of the repurchase option, and the surviving lien held by Washington Mutual, which is relevant to determine the value paid by the purchaser under *Miller*. Using these figures, Whitaker paid between 87.2% ($195,418.06/224,000) and 87.5% ($201,418.06/230,000) of the fair market value of the Debtors' property. These figures further support the Bankruptcy Court's ruling that Whitaker paid "present fair equivalent value" for the Debtors' property, and its ruling will be affirmed.

### C. The Bankruptcy Court did not err by ruling that Underwood and Walkwood have no liability to the Trustee.

Finally, the Trustee contends that the Bankruptcy Court erred by finding that Underwood and Walkwood could not be held liable to the Trustee. The Bankruptcy Court found that Underwood, in his capacity as president of Walkwood, arranged for the Debtors to meet with Whitaker to discuss the sale of their home so they could avoid foreclosure. The Bankruptcy Court also found that Walkwood was paid $10,183.30 for its involvement in the transaction, but that neither it nor Underwood acquired any interest in the Debtors' property. In its review of the record, the Court cannot conclude that the Bankruptcy Court's factual findings as to Underwood and Walkwood were clearly

erroneous. Therefore, the Court will affirm the Bankruptcy Court's decision to dismiss the claims against Underwood and Walkwood.

## IV. Conclusion

Finding neither legal nor factual error in the Bankruptcy Court's ruling, this Court will affirm the Bankruptcy Court's decision.

An appropriate Order will accompany this Memorandum Opinion.

                                                /s/
                                  Henry E. Hudson
                                  United States District Judge

ENTERED this 12 day of May, 2009.
Richmond, VA